Lambert Willett et al. [1] v. Commissioner. Willett v. Commissioner
Docket Nos. 47500-47504.
United States Tax Court
T.C. Memo 1957-189; 1957 Tax Ct. Memo LEXIS 66; 16 T.C.M. (CCH) 840; T.C.M. (RIA) 57189; September 30, 1957
*66 Issue 1. A partnership acquired an inventory of whiskeys, represented by warehouse receipts, during the time that O.P.A. controls over whiskey prices were in effect. The partnership's business was acquiring and selling whiskey warehouse receipts. After O.P.A. controls over whiskey ended, the partnership stopped acquiring warehouse receipts; also market prices of whiskey rose. The partnership gave a broker its inventory of warehouse receipts in July 1947 and told him the partners would sell their interests in the partnership. The broker gave the inventory to X who represented Y corporation. At the end of July, the partners formed W corporation and exchanged the inventory for stock. In August, A and B corporations, affiliates of Y corporation, agreed to buy all of the stock of W corporation, X representing A and B who wanted to acquire the inventory. Held, the substance of the transaction constituted a sale of the inventory of the partnership rather than sales of common stock of W corporation, and the partnership realized ordinary income from the sale of its inventory. Issue 2. Held, that Lambert Willett made completed, bona fide gifts in 1945 of fractional parts of his interest *67 in a partnership to each of three children, John, Paul, and Mary C., who were members of the partnership, and that the interest in the partnership of each donee was thereby increased. Held, further, that Lambert and Mary T. made completed gifts out of their respective interests in the partnership to three other children, Joseph, Robert, and Charles, and that they became bona fide members of the partnership. Held, further, that petitioners have failed to prove that another son, Norman, was a bona fide member of the partnership. Charles I. Dawson, Esq., Rucker Todd, Esq., and John A. Fulton, Esq., Kentucky Home Life Building, Louisville, Ky., for the petitioners. Charles R. Hembree, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Docket No.
Petitioner
1945
1946
1947
47500
Lambert Willett
$6,671.55
$24,210.44
$101,180.12
47501
Mary T. Willett
1,496.19
6,797.54
37,190.59
47502
John L. Willett
none
none
3,047.46
47503, 47504
Thompson Willett, et al.
76.81
1,006.45
30,079.67
The issues relate to a partnership, Willett Brokerage Company, and a corporation, Wildwood. The Commissioner recognizes the partnership as a bona fide one having six partners, including the four petitioners. The partnership was engaged in the business of buying and selling whiskey at wholesale. The questions to be decided are as follows: (1) Whether *69 transactions in 1947 constituted in substance sales by the partnership of whiskey warehouse receipts resulting in ordinary income to the partnership, as the Commissioner has determined, or whether the transactions were sales of stock of Wildwood Corporation, to which the warehouse receipts had been transferred by members of the partnership in exchange for stock, which was the form of the transactions, resulting in the realization by the petitioners of long-term capital gain, as they contend. (2) Whether the interests of Lambert and Mary T. Willett in the partnership were reduced by gifts of their original interests to John L. Willett and other children of Lambert and Mary Willett (except Thompson) some of whom are alleged to have acquired increases in their original partnership interests, and some of whom are alleged to have become members of the partnership. The Commissioner has determined that original partnership interests were not increased by the purported gifts (except to Thompson) and that four children, Norman, Joseph, Robert, and Charles, were not members of the partnership. Some of respondent's determinations are not contested. One issue raised by pleadings has not been *70 settled. Effect will be given to the settlement under Rule 50. Findings of Fact The petitioners are residents of Bardstown, Kentucky. They filed their returns with the collector of internal revenue for the district of Kentucky. Lambert and Mary T. Willett are the parents of the following individuals who are involved in the issues presented: Thompson, who was 36 years of age in 1945; Norman, 34; John, 33; Mary C., 30; Paul, 29; Joseph, 27; Robert, 24; and Charles, 20. Lambert was engaged in the whiskey distilling business for many years prior to 1944. He was superintendent of the Bernheim Distillery in Louisville, Kentucky (which is about 60 miles from Bardstown) from 1933 to 1941. He was one of the principal stockholders in Willett Distilling Company, a Kentucky corporation, which was organized in 1936. Willett Distilling Company has at all times material operated a whiskey distillery in Bardstown, Nelson County, Kentucky. It still operates the distillery. All of its 5,000 shares of capital stock was originally owned by four individuals, namely, Lambert and his wife, Mary T., and their two sons, Thompson and John. At some time before December 3, 1943, Paul and Mary C. acquired *71 stock in the corporation from some of the other stockholders, so that all of the stock was held by six members of the Willett family, as follows: Lambert, 2,195 shares; Mary T., 953 shares; Thompson, 850 shares; John, 503 shares; Paul, 250 shares; and Mary C., 249 shares. Thompson and Mary T. were president and vice president of the corporation, respectively, in 1936 and thereafter. In 1945, Mary C. was secretary and John was treasurer. The distilling corporation began making and selling whiskey in 1937. It owned a warehouse where it deposited its products under whiskey warehouse receipts. It did not own a bottling plant. The corporation's whiskey was bottled, when necessary, at nearby bottling plants owned by others. On December 3, 1943, the corporation sold 921 barrels of whiskey to its six stockholders for $27,920.06, which was the corporation's cost. Each stockholder received an undivided interest in the whiskey, evidenced by warehouse receipts, in the same proportion as the number of shares of stock in the corporation which he owned bore to the 5,000 shares of outstanding stock. On the same date, the above-named individuals entered into a joint venture agreement, as the owners *72 of 921 barrels of whiskey, under which the whiskey could be sold and each would be entitled to receive a share of the proceeds of sales in the same proportion as his undivided interest in the warehouse receipts. Under this joint venture agreement Lambert was appointed the agent and attorney in fact for all. He was succeeded by Thompson. However, while this agreement was in effect, no whiskey was sold. The Emergency Price Control Act was enacted on January 30, 1942. This legislation was extended from time to time, and it was in effect until June 30, 1947. During the existence of O.P.A., which was established under the above legislation, the prices of whiskey were fixed by O.P.A. There was an interval from June 30, 1946 until July 25, 1946, when O.P.A. was not in effect, but by legislation of July 25, 1946, O.P.A. was extended to June 30, 1947. In July 1946, the administrator of O.P.A. was empowered to decontrol whiskey and other items. Whiskey was released from O.P.A. regulations effective October 24, 1946. In 1942 and 1943, distilleries operated under war restrictions imposed by the Federal Government. Under such restrictions, Willett Distilling Company was required to produce *73 alcohol and its production of whiskey was limited during 1942 and 1943. By 1945, the corporation's production of whiskey had been increased as various war restrictions were removed and the grains used in production became increasingly available. Toward the end of 1944, the six members of the joint venture decided to form a partnership to which they would contribute their interests in the 921 barrels of whiskey. A certificate of partnership was filed on December 18, 1944 in the office of the Clerk of the County Court of Nelson County. The name under which the partnership was to do business was Willett Brokerage Company. A written partnership agreement, dated January 1, 1945, was entered into by Lambert, Mary T., Thompson, John, Paul, and Mary C., all of whom executed the agreement. Each contributed to the partnership his and her undivided interest in the 921 barrels of whiskey. The original capital of the partnership amounted to $15,246.17, the equity of the owners in the whiskey acquired on December 3, 1943, which amount was their cost less borrowed funds. The place of business of the partnership was Bardstown, Kentucky, and its business was the buying and the selling at wholesale *74 of bulk and packaged whiskey and of the warehouse receipts therefor. The material provisions of the partnership agreement provided, in general, that the partners would share in profit and loss in the same proportion as their partnership interests; that the active management and operation of the business would be under the direction and control of Lambert who would be known as the manager; that Lambert would receive reasonable compensation for his services which would be agreed to by the partners; that books of account would be maintained to which each partner would have access at all times; and that an accounting report of the business would be made to each partner at least once a year. If a partner desired to retire, the remaining partners had the right to acquire such partner's interest provided they did so within 90 days; but if they did not do so, the partner who wanted to retire had the right to demand liquidation of the partnership. The partnership's accounting was on the basis of a fiscal year ended October 31. All of the formal requirements to create a legal partnership were satisfied. In addition, the partnership applied for and received a basic permit from the Federal *75 Alcohol Administration. Partnership books of account were opened in which a capital account was set up for each partner, to which his contribution to the partnership's capital was credited. Lambert's salary as manager was fixed at $250 per month which was treated as an expense in the partnership's books. The Commissioner has recognized the partnership which was created on January 1, 1945 as a valid and bona fide partnership in which the partners and their partnership interests were as follows: Lambert, 2,195/5000; Mary T., 953/5000; Thompson, 850/5000; John, 503/5000; Paul, 250/5000; and Mary C., 249/5000. Soon after the execution of the aforesaid partnership agreement, Lambert and Mary T. undertook the making of gifts of parts of their respective interests in the partnership to all of their children who were then 21 years of age, or over. These gifts were made by means of a bill of sale, which also was dated January 1, 1945, to which the parties were Lambert and Mary T. and each of the alleged donees, namely, Thompson, John, Paul, and Mary C., who were members of the original partnership, and Norman, Joseph, and Robert. Lambert undertook to give to Thompson, John, Paul, Mary *76 C., and Norman, each, 286/5000 out of his interest in the partnership, and he undertook to give to Joseph 54/5000 out of his interest. Mary T. undertook to give Joseph 232/5000, and Robert, 286/5000 out of her interest. Lambert's purported gifts aggregated 1,484/5000, which would reduce his interest to 711/5000. The purported gifts of Mary T. aggregated 518/5000, which would reduce her interest to 435/5000. The bill of sale provided that the six members of the existing partnership agreed to the transfers by Lambert and Mary T. of the stated portions of Lambert's and Mary T.'s respective interest in the partnership to each of the donees; and that the members of the partnership agreed, further, that Norman, Joseph, and Robert would become members of the partnership under the partnership agreement, each having a 286/5000 interest in the partnership, and that the interests in the partnership of Thompson, John, Paul, and Mary C. were increased by 286/5000, the amount of the purported transfers to each of them from Lambert. Each of the donees, Thompson, John, Paul, Mary C., Joseph, and Robert, accepted the gifts from Lambert and Mary T.; and each one of the above-named persons, except *77 Robert, executed the bill of sale along with Lambert and Mary T. Lambert executed the bill of sale for Robert as his attorney in fact. None of the above-named donees gave any consideration for the transfer of the interest given to him or her. Lambert and Mary T. intended to make gifts of an interest in the partnership to each of the above-named children. Entries were made in the capital accounts of Lambert and Mary T., in the books of the partnership, which reflected the transfers of parts of their interests in the partnership to each of the above-named donees, and, also, to Norman. Also, new capital accounts in the partnership's books were opened in the names of Joseph and Robert, and of Norman, also, to which credits were made, respectively, for the transfers of interests in the partnership to each. Credits were made in the capital accounts of Thompson, John, Paul, and Mary C. to reflect the transfers of interests to each of them. After these entries had been made in the several capital accounts, the fractional interests in the partnership and the capital represented thereby were as follows: Capital Accounts
Fractional
of Partners
Interest
Capital
Lambert
711/5000
$ 2,168.05
Mary T.
435/5000
1,326.44
Thompson
1136/5000
3,464.00
John
789/5000
2,405.89
Paul
536/5000
1,634.42
Mary C.
535/5000
1,631.37
Norman
286/5000
872.10
Joseph
286/5000
872.10
Robert
286/5000
872.10
5000/5000
$15,246.47
*78 In making the determinations which have given rise to issues in these cases, the Commissioner has not questioned Lambert's transfer to Norman of 286/5000 out of Lambert's interest in the partnership, but he has refused to recognize all of the other transfers by Lambert out of Lambert's interest; and he has refused to recognize all of Mary T.'s transfers out of her interest in the partnership. Accordingly, the Commissioner has determined that Lambert's and Mary T.'s interests in the partnership were 1909/5000 and 953/5000 respectively, and that the partnership interests of John, Paul, and Mary C. remained 503/5000, 250/5000, and 249/5000, respectively. The Commissioner has determined, also, that Norman, Joseph, and Robert were not members of the partnership. In 1946, Charles, another son of Lambert and Mary T., became 21 years of age. Pursuant to their plan of making gifts to each child as he or she became 21 years of age, Lambert and Mary T. undertook, in June 1946, to make gifts of interest in the partnership to Charles. By means of a bill of sale, Lambert purportedly gave Charles a 212/5000 interest in the partnership, and Mary T. purportedly gave him a 74/5000 interest, so that *79 Charles would receive a 286/5000 interest in the partnership. Lambert and Mary T., each, intended to make such gifts to Charles. Charles accepted the gifts and did not give any consideration for the transfers. For the purpose of Charles's becoming a member of Willett Brokerage Company partnership, a new partnership was formed on June 25, 1946, pursuant to a partnership agreement between Lambert, Mary T., the six children who were parties to the partnership agreement of January 1, 1945, plus Norman, Joseph, Robert, and Charles. The provisions of the new partnership agreement were the same as those of the first partnership agreement except for changes in the fractional interests in the partnership which were stated to be as follows: Lambert, 499/5000; Mary T., 361/5000; Thompson, 1136/5000; John, 789/5000; Paul, 536/5000; Mary C., 535/5000; Norman, 286/5000; Joseph, 286/5000; Robert, 286/5000; and Charles, 286/5000. All of the persons named as parties to the agreement executed the agreement except Norman, who was in California. Lambert executed the agreement for Norman as his attorney in fact. All of the formal requirements for creating a legal partnership were satisfied. A new certificate *80 of partnership was filed on June 26, 1946, and a new application for a basic permit was made, which was granted to the new partnership. All of the partners, except Norman, signed the various documents involved. Lambert executed them for Norman as his attorney in fact. In the books of the partnership, a capital account was opened on June 30, 1946 in the name of Charles which credited him with capital in the amount of $2,796.89, representing an interest of 286/5000. The respective capital accounts of Lambert and Mary T. were properly debited to reflect the transfer of each of an interest to Charles. Lambert's account was debited $2,369.66, and Mary T.'s account was debited $427.23. These amounts represented 212/5000 and 74/5000, respectively, of the then existing credit balance in each of the capital accounts of Lambert and Mary T. after those accounts had received proper credits for the profit of the partnership for its fiscal year ended October 31, 1945, which was due to Lambert and Mary T. The other capital accounts remained the same as they were prior to June 25, 1946. In making the determinations which give rise to the issues, the Commissioner has refused to recognize Charles *81 as a member of the Willett Brokerage Company partnership, and he has determined that the purported transfers to him did not reduce the respective interests of Lambert and Mary T. in the partnership. Turning now to the business of Willett Brokerage Company and the operation thereof during 1945 and 1946, we find that when the partnership was originally created, as of January 1, 1945, there was an understanding with Willett Distilling Company that the sale of all of its whiskey would be handled by the Willett Brokerage Company partnership. Accordingly, during 1945 and 1946, Willett Brokerage Company purchased whiskey, under warehouse receipts, from the distilling corporation. Such purchases were made at prices established under O.P.A. regulations. The partnership, Willett Brokerage Company, then sold the whiskey under warehouse receipts at wholesale. It sold both bulk and bottled whiskey. Lambert and Thompson Willett were the partners who were actively engaged in the conduct of the business of the partnership. Acquisition of whiskey by the partnership was a simple matter because Willett Distilling Company supplied the whiskey and the prices to be paid were fixed by O.P.A. The sale *82 of whiskey at wholesale was the major part of the operation of the partnership's business, and that activity was carried on entirely by Lambert and Thompson who were required to exercise their business judgment and knowledge of the market for whiskey. Lambert and Thompson, however, discussed the operations of the partnership's business with the other partners. The partnership was conducted as a family business. The training and experience of the members of the partnership whose status as partners is not questioned by the Commissioner are as follows: Thompson graduated from college in 1931 and thereafter he was employed by Bernheim Distillery in Louisville, Kentucky, in various departments, finally becoming assistant superintendent of the plant. In 1936 he became an employee of Willett Distilling Company, as well as its president; he helped in the building of its plant; and he continued as its president during all the succeeding years. Mary C. was an employee of the distilling corporation for many years and was its bookkeeper until July 1943. Also, she was the bookkeeper for the Willett Brokerage Company. John is a graduate civil engineer. He worked for the distilling corporation *83 from the fall of 1936 until the spring of 1938, and he resumed working for the corporation in the fall of 1945 where he has been employed continuously up to the present time. He has lived in Bardstown at all times except when he was away in school or in military service. Paul is a graduate civil engineer. He has lived in Bardstown most of his life. He worked at Bernheim Distilling Company while he was in engineering school. He started working for Willett Distilling Company in 1937. He supervised the construction of a warehouse for that corporation. He is now assistant manager of Willett Distilling Company, primarily in charge of bottling. He was a pilot in the Army Air Corps during the war. The training, experience, and background of Norman, Joseph, Robert, and Charles are as follows: Norman, after completing a university engineering course, became an aeronautical engineer which is his present profession. He did not work for the Willett Distilling Company. He first worked in various plants, as an engineer, in Hartford, Connecticut, and Baltimore, Maryland. For several years before 1945, he did not live in Bardstown. Prior to 1945, he went to southern California to work in airplane *84 manufacturing plants. Eventually he became employed by the Civil Aeronautics Administration in southern California. He has lived in Hollywood, California, continuously since sometime before 1945, and he still lives there. Joseph entered the Army Air Corps in 1942 after graduating from college. He became a pilot. He was stationed in Florida. He was discharged from the Army in the fall of 1945. He worked for Willett Distilling Company during his vacations while he was in college, and he was employed by that corporation again in the fall of 1945 until sometime in 1947. He set up and operated the distilling corporation's testing laboratory and, at times, he worked as a distiller. When he was married in 1945, he set up his own home. He is now an economist by profession and is employed by the Government in Washington, D.C. Robert's college work was interrupted by his military service. He entered the Army Air Corps in 1944. He became a pilot. He received his discharge on September 19, 1945, when he returned to his parent's home in Bardstown. He was employed as a distiller by Willett Distilling Company from October 1945 until February 1947 when he returned to college to complete studies *85 for a degree which he received in May or June 1947, when he returned to Bardstown where he lived until September 1947, when he, with his wife, moved to Alexandria, Virginia. He then studied law at Georgetown University in Washington, D.C. After becoming a member of the Virginia bar, he practiced law and also went into a real estate development business in Virginia. Charles entered the V-12 College Training Officer Program of the Navy in July 1944, when he was 19 years of age, attending the Berea College in Kentucky until July 1945, and then, other colleges until he received his discharge on June 22, 1946, when he returned to Bardstown for three months. On October 1, 1946, he entered Villanova College under the Navy's Reserve Officer Training Program. He graduated and received a commission in June 1947, after which he returned to his parents' home in Bardstown. Charles worked at Willett Distilling Company during vacations and he developed an enduring interest in the liquor business. Eventually he went into his own wholesale liquor business in Kentucky, as a sole proprietor, under the name of Kentucky Liquor and Wine Company. Joseph and Robert were away from Bardstown in military *86 service during 1945 until the fall of 1945, but each returned home during furloughs or while en route to new posts of duty. Charles, also, returned home from time to time during 1946 while he was attending colleges. During 1945, while they were in military service, Joseph and Robert participated in the discussions about the business of the Willett Brokerage Company business, the partnership; and after they returned to Bardstown in the fall of 1945 they participated actively in the conduct of the partnership's business on a discussion and consultation basis, as they did during 1946 and 1947. Joseph worked for the partnership as a bookkeeper. Charles was in Bardstown when his parents made gifts to him of interests in the partnership in June 1946, and he, also, participated in the conduct of the partnership's business on a discussion and consultation basis during 1946 and 1947. Joseph, Robert, and Charles were present at informal meetings of the partners when the partnership's business problems were discussed, from time to time, depending upon when each was in Bardstown. Joseph, Robert, and Charles regarded themselves as members of the partnership. Norman did not render any services *87 to the partnership; he did not attend any meetings of the partners; and he did not participate in any discussions about the partnership's business. He lived and worked in California during the entire period of the existence of the partnership. He did not appear at the trial of these cases and the record does not contain any testimony from him. Although his capital account in the ledger of the partnership shows credits of profits to him as well as debits for withdrawals, there are no explanations in the record of the purposes of the withdrawals or the disposition thereof. Lambert had a power of attorney from Norman. With respect to the earnings of the partnership during 1945, 1946, and 1947, proportionate shares of earnings were credited periodically to each of the partners, in accordance with the interest of each, in the capital account of each. Thompson, John, Paul, Mary C., Joseph, Robert, and Charles, as well as Lambert and Mary T., made withdrawals of the earnings credited to him, or to her, from time to time, for income tax payments and for personal uses, and each was free to make withdrawals. Whenever any one of the above-named persons desired to withdraw earnings of the partnership *88 which had been credited to him or her, such withdrawals were debited to the capital account of the person making the withdrawal. No withdrawals of one person were ever charged against another individual's capital account. For example, the withdrawals of Lambert and of Mary T. were debited to the capital account of each and they were never charged to any other person's capital account. In 1946, Paul made withdrawals from his share of partnership earnings to make payments on the purchase of a home and to buy furniture. Joseph made withdrawals from his share of such earnings to make investments in a farming venture and in real estate. Robert made withdrawals from his share of partnership earnings for the expenses of his family and of his education; and Charles made withdrawals from his share of such earnings for the expenses of his education. Each of the above-named partners (excluding Norman about whose withdrawals we know nothing) left some of the partnership earnings which had been credited to his or her capital account in the business, and most of the above-named persons made loans to Willett Distilling Company, out of his or her share of partnership earnings, for which he or she *89 received notes of the distilling corporation bearing four or five per cent interest, which interest was paid. Such loans were repaid by the distilling corporation. As is set forth in more detail hereinafter, a corporation named Wildwood was organized on June 30, 1947, to which almost all of the assets of the partnership, Willett Brokerage Company, were transferred in exchange for all of Wildwood's stock, and in September 1947 all of the stockholders of Wildwood sold all of their Wildwood stock. Each member of the partnership received stock in Wildwood in the same proportion as his or her proportionate interest in the partnership. Each member of the partnership, except Norman, participated in the discussions relating to transferring assets of the partnership to Wildwood corporation, and in the discussions about selling the Wildwood corporation stock. When the stock in Wildwood corporation was sold, each stockholder received payment in cash for his stock. The partnership was dissolved in May 1948. Each of the partners (excluding Norman about whom the record reveals little) received his and her proportionate share of the remaining assets of the partnership. The record does not show *90 what Norman did with the payment which he received for stodck of Wilwood corporation which stood in his name. Joseph, Robert, and Charles, each, used the cash which he received from the sale of Wildwood corporation stock as he saw fit, either for his own personal use or for investments. Each had dominion and control of the proceeds he received from the sale of his stock in Wildwood. Each used some of the proceeds from the sale of his stock to make loans to Willett Distilling Company which gave interest bearing notes for such loans, paid interest thereon, and eventually repaid the loans. Robert deposited some of the proceeds from the sale of his Wildwood stock in his own bank account; he invested some of the proceeds in real estate; he invested some of the proceeds in a new business which was to make a small automobile, which proved to be a failure and resulted in a loss to Robert. Charles invested some of the proceeds from the sale of his Wildwood stock in his own business, in real estate in Virginia, and in a home. Lambert Willett made completed, bona fide gifts in January 1945 and June 1946 of parts of his original 2,195/5000 interest in Willett Brokerage Company, a partnership, *91 to each of his children Thompson, John, Paul, Mary C., Joseph, and Charles in the proportions set forth herein. Mary T. made bona fide, completed gifts in January 1945 and June 1946 of parts of her original 953/5000 interest in the same partnership to each of her children Joseph, Robert, and Charles, in the proportions set forth herein. Each donee accepted each gift. The gifts of Lambert in January 1945 of parts of his interest in the partnership to John, Paul, and Mary C. increased the existing interest of each donee in the partnership by 286/5000. Joseph, Robert, and Charles intended in good faith and with a business purpose to join together with Lambert, Mary T., Thompson, John, Paul, and Mary C., as partners, in the present conduct of the business carried on under the name, Willett Brokerage Company; and the above-named individuals intended in good faith and with a business purpose to have Joseph, Robert, and Charles join with them as partners in the present conduct of the business. Norman Willett did not in good faith really join with the others, with a business purpose, in the present conduct of the Willett Brokerage Company business; and he did not intend doing so. In addition *92 to the foregoing facts, the following facts are particularly relevant to a separate issue in these cases: The partnership, Willett Brokerage Company, carried on a substantial wholesale business during 1945, 1946, and part of 1947, purchasing large amounts of whiskey, evidenced by negotiable warehouse receipts, from Willett Distilling Company, and selling such inventories of whiskey. During 1945, the partnership purchased from the distilling corporation 2,982 barrels of whiskey for $117,921.94. During March, April, and May of 1946, the partnership purchased 3,739 barrels of whiskey for $163,094.17. The last purchase which the partnership made from the distilling corporation was on May 2, 1946, when it purchased 589 barrels for $26,171.85. By a statute which the Congress enacted on June 30, 1945, The Emergency Price Control Act, under which O.P.A. had been created, was extended to June 30, 1946. After June 30, 1946 until July 25, 1946, the O.P.A. was not in effect, but legislation renewing O.P.A. for an additional year was enacted on July 25, 1946. During the period from January 1, 1945 to October 31, 1946, the sales of whiskey by the partnership, under warehouse receipts, aggregated *93 the total sum of $1,258,319.32. Sales during the 7 month period, November 1, 1946 to October 31, 1947, totaled $146,489.64. Sales during each of the months of March, May, and June of 1946 were substantially less than sales during the preceding months, as the following schedule shows: 1946
Sales
July
$209,223
August
5,810
September
106,589
November
33,412
December
48,324
1947
January
20,019
February
34,144
March
6,882
May
1,055
June
2,651
On or about July 3, 1947, the partnership's inventory of whiskeys, represented by warehouse receipts, was as follows: Barrels
2,937
Cases of bonded whiskey, fifths
2,013
Cases of bonded whiskey, pints
721
Cases of 4 year old whiskey, fifths
224
Cases of 4 year old whiskey, pints
200
Fred Metzger, a broker who carries on the business of buying and selling whiskey, was engaged in that business in 1947, and before. His office was located in Newark, New Jersey. At the end of June and the beginning of July 1947, Thompson Willett had telephone conversations with Metzger during which Thompson told Metzger that Willett Brokerage Company owned an inventory of whiskey represented by warehouse *94 receipts; that Willett Brokerage Company was a partnership; and that if the whiskey was to be sold, the partners would consider selling their interests in the partnership in preference to selling the whiskey warehouse receipts because they understood that if interests in the partnership were sold, the profit realized could be treated as capital gain and the partners wanted to obtain capital gain treatment. Metzger asked for an inventory of the partnership's whiskeys. On July 3, 1947, Willett Brokerage Company sent Metzger a letter in which its inventory, as set forth above, was stated and described. The letter was signed by Thompson. The closing paragraph stated, "If the above is of interest along the lines we discussed on the telephone, we shall be glad to go further into detail." On July 7, 1947, Metzger sent a letter to J. E. Friel, an officer of Joseph E. Seagram & Sons Co., whose office was in New York City, to confirm an earlier conversation with Friel, in which he advised Friel that "a partnership, the Willett Brokerage Company, wants to sell the partnership with all the whiskey which it owns. There are no other assets. You will find enclosed a list of those holdings, also. *95 " Metzger attached to the letter a list of the inventory of barrels and cases of whiskey which he made from the letter to him from Willett Brokerage Company dated July 3, 1947. Metzger went away on his vacation during July, from which he returned at the end of July or the first part of August. Upon his return, Metzger learned from Thompson that a corporation, Wildwood Corporation, had been organized which had an inventory of whiskey. The facts about the organization of Wildwood are set forth hereinafter. On August 6, 1947, Metzger told Thompson that "a client" was interested in purchasing all of the stock of "Willett Brokerage Company", and was willing to make a contract immediately for the purchase of the stock. It was immaterial to Metzger what the name of the corporation was, Willett or Wildwood. The "client" was J. E. Friel, but at this time Metzger did not give his name. Metzger suggested that Thompson, Lambert, and their attorney should go to New York because the purchase contract probably could be written up quickly. Thompson said that he would discuss the proposal with the other stockholders. Thereafter, arrangements were made for the Willetts to meet Metzger in New York *96 City on August 19. Lambert, Thompson, their attorney, and their accountant met Metzger in New York on that day and Metzger took them to Friel's office. Negotiations then started which ended with the sale of all of the common stock in Wildwood Corporation. On July 30, 1947, Wildwood Corporation was organized under Kentucky laws, and on July 31, 1947, a written agreement was executed between the partners of Willett Brokerage Company and Wildwood which provided that practically all of the partnership's inventory of warehouse receipts for whiskeys would be exchanged for common stock in Wildwood, and that preferred stock in Wildwood would be issued in exchange for notes of the individual members of the partnership. Each member of the partnership was to receive Wildwood stock in the same proportion as his interest in the partnership. The partnership was to retain a small amount of assets. As of July 31, 1947, prior to the execution of the agreement with Wildwood, the partnership's total assets, per books, were in the amount of $308,003.53, of which its inventory of warehouse receipts amounted to $165,602.75. The current liabilities were $144,796.01, and net worth, the partners' interests, *97 amounted to $163,207.52. Under the agreement with Wildwood, as carried out, the partnership transferred to Wildwood warehouse receipts for whiskey in the amount of $164,152.75, plus cash in the amount of $9,921.33, and other assets which brought the transferred assets up to $177,376.01. Wildwood assumed liabilities of the partnership in the amount of $144,376.01, chiefly notes payable in the amount of $144,060, so that the net amount of the transferred assets was $33,000, for which Wildwood gave in exchange 330 shares of common stock having a par value of $33,000. The inventory of whiskey received by Wildwood was as follows: Whse. Rcts. - Bulk whiskey
$139,667.82
Whse. Rcts. - Case goods
24,484.93
$164,152.75
The partnership retained an inventory of whiskey in the amount of $1,450; cooperage, $12,539.74; cash, $39,332.14; notes receivable, $75,000, and other minor assets, $2,305.64; total, $130,627.52. It retained liabilities of $420. Its net worth then was $130,207.52. The partners received common stock of Wildwood as follows: Lambert
33 shares
$ 3,300
Mary T
24 shares
2,400
Thompson
75 shares
7,500
John
52 shares
5,200
Paul
35 shares
3,500
Mary C.
35 shares
3,500
Norman
19 shares
1,900
Joseph
19 shares
1,900
Robert
19 shares
1,900
Charles
19 shares
1,900
330 shares
$33,000
*98 Also, each of the partners received preferred stock in Wildwood for which each gave his note in the amount of the par value of such stock. The inventory of whiskeys, represented by warehouse receipts, which the partnership transferred to Wildwood Corporation, was made up of the following: Barrels
2,933
Cases of bonded whiskey, fifths
1,963-2/12
Cases of bonded whiskey, pints
564
Cases of 4-year-old whiskey, fifths
224-7/12
Cases of 4-year-old whiskey, pints
200 The above inventory was very close to the list of the partnership's inventory which Willett Brokerage Company sent to Metzger on July 3, 1947, and it was substantially all of the partnership's inventory of whiskeys (or warehouse receipts) at the time Wildwood Corporation was created. At the meeting with Friel on August 19, 1947, the Willetts were advised that the buyers were interested in buying all of the common stock in Wildwood but that they deemed it inadvisable for all of that stock to be purchased by one buyer, and, therefore, that two corporations would be the purchasers, Distillers Distributing Corporation and West Shore Wine & Liquor Company, Inc. Both of these corporations were subsidiaries *99 or affiliates of Joseph E. Seagram & Sons Co. The negotiations between the Willetts and Friel extended over several days. Consideration was given to the then market prices of the various bulk whiskeys and bottled whiskeys held by Wildwood as of August 15, 1947, and to the amounts of taxes and storage charges which would have to be paid by the purchasers of stock in Wildwood when they withdrew whiskey from a warehouse. It was agreed that the Wildwood preferred stock would be retired by Wildwood prior to consummation of the sales of the common stock after it returned notes received for that stock. The price to be paid for the common stock was $1,044.39 per share. It was further agreed that Distillers Distributing Corporation would purchase 255 shares of Wildwood common stock, or about 77.3 per cent, and that West Shore Wine & Liquor Company would purchase 75 shares, or about 22.7 per cent. The terms of the proposed transaction were reported by Lambert and Thompson to the others who held Wildwood stock, and they agreed to the terms. Agreements which were dated back to August 15, 1947, were drafted. They were identical in terms, except for the differences in names and the amounts of *100 the stock involved. The closing date was September 19, 1947. The agreement of Distillers Distributing Corporation was with Lambert, Mary T., John, Paul, Mary C., Norman, Joseph, Robert, and Charles. That corporation paid $266, 320.50 for 255 shares of common stock of Wildwood. The agreement of West Shore Wine & Liquor Company was with Thompson who received $78,329.55 for 75 shares of common stock. The total amount received by the Willetts for 330 shares of common stock of Wildwood was $344,650.05. After Wildwood Corporation was created, and before August 15, 1947, two transactions were carried out in the name of Wildwood with a Cincinnati company, R. L. Buse Company, to which warehouse receipts for 50 barrels of whiskey were sold on August 6, and warehouse receipts for 10 barrels were sold on August 11, for an aggregate price of $9,143.22. The invoices used in these two transactions were the printed bill forms of Willett Brokerage Company on which was typed above "Willett Brokerage Company" the words, "Wildwood Corporation Successor To." The cost to the seller of these 60 barrels of whiskey was $2,590.58, to which were added storage charges and ad valorem taxes totaling $213. These *101 transactions reduced the inventory of bulk whiskey which allegedly had been transferred to Wildwood from 2,933 barrels to 2,873. There were no changes in the numbers of cases of bottled whiskey which allegedly had been transferred to Wildwood by the partnership. Accordingly, as of August 15, 1947, Wildwood's inventory consisted of warehouse receipts for the following: Barrels of whiskeys
2,873
Cases, bonded whiskey,
fifths
1,963-2/12
Cases, bonded whiskey,
pints
564
Cases, 4-year-old whiskey,
fifths
224-7/12
Cases, 4-year-old whiskey,
pints
200
2,951-9/12
The purchasers of the common stock of Wildwood obtained the above inventory of whiskeys by the purchase of the common stock. The partnership's costs of the above inventory, which were carried over to Wildwood, and the market values as of August 15, 1947, were as follows: Adjusted
Market
Inventory
Cost
Value
2,873 barrels
$144,680.29
$424,405.32
2,951-9/12 cases
26,109.08
53,808.10
$170,789.37
$478,213.42 As of August 15, 1947, according to accounting records which had been set up for Wildwood, there were some liabilities, which had been carried over from *102 the Willett Brokerage Company partnership, in the amount of $152,473.50, which included notes payable in the amount of $141,660, which notes were secured by warehouse receipts which were part of Wildwood's inventory. When such liabilities, plus reserves for taxes, and an undisclosed amount for the estimated storage charges and ad valorem taxes on whiskeys in warehouses are subtracted from the market value of Wildwood's inventory of whiskeys, the result is approximately $344,650.05, the sum which was paid for Wildwood's common stock. Prior to the closing date of the agreement with the purchasers of Wildwood's common stock, the Willetts took back their notes for Wildwood's preferred stock, they returned that stock, and it was retired. The Willetts received payment for and delivered all of Wildwood's common stock on September 29, 1947. Payment for the common stock was made by checks made payable to individuals as set forth below, and the checks were received by the respective payees: Amounts of
Payee
Checks
Lambert
$ 34,465.01
Mary T.
25,065.46
Thompson
78,329.55
John
54,308.49
Paul
36,553.79
Mary C.
36,553.79
Norman
19,843.49
Joseph
19,843.49
Robert
19,843.49
Charles
19,843.49
$344,650.05
*103 Metzger received the usual brokerage commission, such as he usually received, for his services in the transaction which resulted in the sale of Wildwood's common stock. Prior to 1946, Willett Distilling Company did not have its own bottling plant. It is normal and, on the whole, customary for a distillery to own a bottling plant. The bottling of whiskey is one of the proper functions of a distillery. In January 1946, the directors of the Distilling corporation decided that it would construct such plant, and the construction thereof began in September 1946 and was completed in the middle of 1947. The bottling plant cost $25,000, and its equipment cost $15,000, or a total of $40,000. The corporation applied for a permit to operate the plant. In August 1947, Distilling corporation bought about $2,300 of "glass", or bottles, for use by the bottling plant, or 2,900 cases of bottles. The bottles were received during August. In January 1948, the corporation bought 485 cases more of bottles. On August 14, 1947, Distilling corporation applied for approval of its own labels to put on bottles at the bottling plant. Approval of a label was received on August 22, 1947. The Distilling corporation *104 has operated and still operates its bottling plant. It has acquired permits to use various labels in addition to those which it applied for in August 1947. The Commissioner determined that Wildwood Corporation was a mere conduit through which the partnership, Willett Brokerage Company, in fact sold whiskey warehouse receipts, and that the corporate entity of Wildwood should not be recognized. He determined, also, that, in fact, the two sales to R. L. Buse Company were sales by the partnership. He determined, therefore, that the partnership received $344,650. He also determined that the cost of the whiskey warehouse receipts which were sold amounted to $33,000; that the costs of the transaction carried out in the form of selling the common stock of Wildwood amounted to $12,200.16; and that the net profit realized after total cost of $45,200.16, was $299,449.84. Accordingly, he increased the income of the partnership for its fiscal year ended October 31, 1947 by the above amount. The petitioners do not dispute the computation of net profit in the amount of $299,449.84. The transfer of the inventory of whiskey to Wildwood, the issuance of the stock of Wildwood to the petitioners *105 and to other members or purported members of the Willett Brokerage Company partnership, the transfer of the common stock of Wildwood to Distillers Distributing Corporation and to West Shore Wine & Liquor Company, and the receipt by the petitioners and the other members of the Willett family of checks in the total amount of $344,650.05 were component parts of a single transaction, by which the Willett Brokerage Company partnership effected a sale of whiskey in the ordinary course of its business. The two transactions in August 1947 with R. L. Buse Company were in fact sales of 60 barrels of whiskey by the partnership. Wildwood Corporation did not engage in any business at any time; it served no business purpose and performed no business function. Wildwood Corporation was created to perform the function of serving as a conduit for the transfer of an inventory of whiskey warehouse receipts from the partnership to the two purchasers, Distillers Distributing Corporation and West Shore Wine & Liquor Company. Opinion HARRON, Judge: The four petitioners in these cases, Lambert and Mary T. Willett, and two of their children, Thompson and John, were members of a partnership, Willett Brokerage *106 Company, during the taxable years 1945, 1946, and 1947. Ultimately, decision of all of the issues presented determines the amounts of the distributable income of the partnership which is taxable to each petitioner for each year under the provisions of sections 22(a) and 181, 1939 Code. During the prtnership's fiscal year ended October 31, 1947, profit in the net amount of $299,449.84 was realized from the transactions with Distillers Distributing Corporation and West Shore Wine & Liquor Company. Respondent's determination that such gain was ordinary gain of the partnership rather than capital gain realized by the ten individuals in whose names shares of common stock of Wildwood Corporation were held, resulted in a very substantial increase in the ordinary income of the partnership which, for the calendar year 1947, would be taxable to each member of the partnership, if respondent's determination is correct. In the other taxable years before us, 1945 and 1946, the partnership realized substantial income from the conduct of its business of selling whiskey as a wholesale dealer. Taxwise, it makes a difference whether there were 6, or 9, or 10 members of the partnership. The respondent *107 has determined that throughout the three years 1945-1947, inclusive, there were only 6 members of the partnership, and that, furthermore, the partnership interests of John, Paul, and Mary C. were not increased above their original, proportionate interests by alleged gifts in January 1945 of Lambert out of his original partnership interest, and his original interest was not reduced by such disputed transfers. It makes no difference in what order each broad issue is considered. Chiefly as a matter of convenience, consideration is given first to the issue involving the Wildwood Corporation. The respondent has determined that the gain resulting from the transactions with Distillers Distributing Corporation and West Shore Wine & Liquor Company is ordinary income of the partnership from the sale of whiskey held by the partnership, Willett Brokerage Company, for sale to customers in the ordinary course of its wholesale business. Petitioners contend that such gain is capital gain derived from the sale of the common stock in Wildwood Corporation. Section 117(a)(1), 1939 Code, is involved. Whether *108 for tax purposes several acts constitute separate and distinct transactions or are integrated steps in a single transaction is a question of fact. United States v. Cumberland Public Service Co., 338 U.S. 451; Commissioner v. Court Holding Co., 324 U.S. 331. In considering such question of fact, the guiding principles, enunciated in numerous cases, have been summarized in Court Holding Co., supra, to be the following: "The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." See, also, Gregory v. Helvering, 293 U.S. 465; Minnesota Tea Co. v. Helvering, 302 U.S. 609; Griffiths v. Commissioner, 308 U.S. 355; Higgins v. Smith, 308 U.S. 473. *109 Although taxpayers have the right to consider tax consequences, the courts scrutinize the facts pertaining to the steps taken and all of the formal arrangements to ascertain the realities of a transaction. The petitioners, who have the burden of proof, seek to establish a lack of contention between what took place when Willett Brokerage Company, a partnership, held an inventory of warehouse receipts for whiskeys and the negotiations with purchasers after Wildwood Corporation was formed which resulted in the sale of all of the common stock of Wildwood. They contend that the creation of Wildwood Corporation was not for the purpose of disposing of an inventory of whiskey warehouse receipts; that after giving the inventory to the whiskey broker, Metzger, on July 3, 1947, the partners in Willett Brokerage Company abandoned the idea of selling their interests in the partnership; that the Willetts firmly determined to continue the business of buying and selling of whiskey warehouse receipts, which had been carried on by the partnership as a corporate business, for which purpose Wildwood was formed; and that the Willetts were induced, in August 1947, by the satisfactory offer of Friel to *110 give up their intention of having Wildwood Corporation carry on such business. After considering carefully the entire record, all of the circumstances, and all of the argument and contentions of the petitioners we conclude that there was in substance a single transaction under which the Willett Brokerage Company, the partnership, sold an inventory of whiskey warehouse receipts in the ordinary course of its business to two affiliates or subsidiaries of Joseph E. Seagram & Sons Co., in which transaction the creation of Wildwood Corporation was one step, the sale of its common stock was another step, and Wildwood Corporation was merely a conduit through which the inventory of whiskey warehouse receipts passed to those who desired to acquire them. Willett Brokerage Company, hereinafter referred to as the partnership, took over the selling of the whiskey produced by Willett Distilling Company, at wholesale, in January 1945. It dealt in whiskey warehouse receipts but, of course, the sales of the warehouse receipts were the means customarily used for selling whiskey which was held in warehouses. During 1945, O.P.A. regulations which fixed the prices of whiskey were in effect and the partnership *111 acquired whiskey from the distilling corporation at the prices established by O.P.A. The parties are agreed about the facts relating to the legislation which extended the Emergency Price Control Act. That legislation was originally enacted in 1942 for a period of one year. Each year thereafter the Emergency Price Control Act was extended for another year until on June 30, 1945, it was extended to June 30, 1946. On May 2, 1946, the partnership made its last purchase of whiskeys from the distilling corporation when it acquired 589 barrels for $26,171.85. The petitioners admit that the managers and members of the partnership realized that it was inevitable that as war conditions receded and normal economic conditions returned the Emergency Price Control Act would end and, with it, O.P.A. As a matter of fact, from June 30, 1946 until July 25, 1946, that legislation was not in effect, and although O.P.A. was extended to June 30, 1947, there was legislation in July 1946 which empowered the administrator of O.P.A. to decontrol certain items, including whiskey, and he removed the controls over whiskey as of October 24, 1946. The petitioners admit that the members of the partnership understood, *112 estimated, and believed that upon the removal of O.P.A. controls over whiskey, the market prices of whiskey would rise. The petitioners have frankly acknowledged that they and the members of the partnership obtained very excellent advice and counselling about all of the tax aspects of their business. We recognize that this was entirely proper; it was necessary; and the Willetts had every right to know, consider, and understand all of the ways in which taxation would impinge upon and follow from their business activities. That being so, the Willetts knew that under O.P.A. controls the partnership's cost basis of whiskey and the warehouse receipts would turn out to be low enough, in comparison with the market prices of whiskey after the removal of O.P.A. controls, to result in the realization of profits, which might be rather large, upon the sale after the end of O.P.A. of an inventory of whiskey acquired while O.P.A. was in effect. Having this in mind, Lambert and Thompson made it plain to the whiskey broker, Metzger, that if the partnership's inventory of whiskey was to be sold they wanted to sell the partnership so as to be able to obtain capital gains treatment of the anticipated *113 gains. The Willetts understood from their tax advisers that a sale of partnership interests might qualify for capital gains treatment if the Commissioner of Internal Revenue accepted the doctrine set forth in Commissioner v. Shapiro, 125 Fed. (2d) 532 (C.A. 6, 1942), and Thornley v. Commissioner, 147 Fed. (2d) 416 (C.A. 3, 1945). At any rate, such view was then held by at least two United States Courts of Appeals. Metzger's understanding of the desire of the Willetts in this respect was reflected in his letter of July 7, 1947 to Friel in which he advised Friel "that a partnership, the Willett Brokerage Company, wants to sell the partnership with all the whiskey which it owns. There are no other assets." Friel was not interested in purchasing the partnership, but he was interested in arranging to acquire the partnership's inventory of whiskey warehouse receipts, nevertheless, as the entire record before us relating to the matter shows. This result was achieved by the purchase of all of the common stock of Wildwood Corporation by two corporations controlled [2] by the corporation which Friel represented, namely, Joseph E. Seagram & Sons Co. The inventory *114 of whiskeys and the warehouse receipts therefor held by Wildwood as of August 15, 1947 was practically the same as the inventory which Willett Brokerage Company submitted to Metzger on July 3, 1947, which in turn, Metzger forwarded to Friel on July 7, 1947. The transaction of sale which was agreed to in August 1947 was, in fact, initiated in July 1947 by the partnership before Wildwood Corporation was organized. When all of the steps were completed in August, we find that the same inventory, the same broker (Metzger), and the same buyer (Friel who represented Seagram & Sons Co.) were involved as were involved in the early part of July. The question we are called upon to decide is simple: "Was the sale made by Willett Brokerage Company, or by Wildwood Corporation after acquisition of the inventory of warehouse receipts by the transfer from Willett Brokerage Company, the partnership?" In our opinion, the sale was made by the partnership which instituted the initial step in the series of steps which included the substitution of the common stock of the newly formed Wildwood Corporation for partnership interests as the formal subject matter of the sale. *115 Petitioner's candidly admit that they gave consideration to the question whether gain realized from the sale of partnership interests might receive capital gains treatment, and that in June and July 1947 Metzger was told that the Willetts were interested in the form which a transaction would take because they wanted to avoid selling the whiskey warehouse receipts, as such, since gain from the sale of the warehouse receipts would be taxable as ordinary income due to the definition of capital assets in section 117(a) of the 1939 Internal Revenue Code, which excluded from the class defined as "capital assets", "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Then, they argue that there was no point in substituting a corporation and its stock for a partnership and partnership interests. "Why", in effect, they argue, "should we have gone to the trouble of forming Wildwood Corporation when a sale of partnership interests would have enabled us to obtain *116 capital gains treatment just as well as sales of stock in a corporation would have done, since we could have 'tacked' on the holding period of our partnership interests to the shorter holding period of stock in Wildwood Corporation?" We are not impressed by petitioners' arguments along this line for several reasons, all of which relate to considerations of tax consequences. In the first place, the Commissioner of Internal Revenue had a clearly defined rule, in 1947, that an interest in a partnership is not, per se, a capital asset. It was not until 1950, that the Commissioner, in G.C.M. 26379, C.B. 1950-1, page 58, changed his previously held view that the sale of a partnership interest is a sale of the selling partner's undivided interest in each specific partnership asset, and then adopted the rule (which petitioners, in 1947, hoped would become the prevailing view) that the sale of a partnership interest should be treated as the sale of a capital asset, provided "the transaction in substance and effect, as distinguished from form and appearance, is essentially the sale of a partnership interest." G.C.M. 26379, supra. The former view of the Commissioner *117 was set forth in G.C.M. 10092, C.B. XI-1, page 114 (1932), it was in effect in 1947, and it was not revoked until the promulgation in 1950 of G.C.M. 26379, supra. It is observed that it was not until after 1947, that the "weight of authority" developed in favor of so-called "entity theory," which is to the effect that a partnership interest is distinct from the firm's assets. See, for example, Commissioner v. Lehman, 165 Fed. (2d) 383 (C.A. 2, 1948), certiorari denied 334 U.S. 819; Commissioner v. Smith, 173 Fed. (2d) 470 (C.A. 5, 1949), certiorari denied 338 U.S. 818; Long v. Commissioner, 173 Fed. (2d) 471 (C.A. 5, 1949), certiorari denied 338 U.S. 818; and Swiren v. Commissioner, 183 Fed. (2d) 656 (C.A. 7, 1950), certiorari denied 340 U.S. 912. It is true that the United States Court of Appeals for the Sixth Circuit had held in 1942, in Commissioner v. Shapiro, supra, that *118 the sale of an interest in a partnership constituted the sale of a capital asset resulting in capital gain under section 117(b) of the Revenue Act of 1934, and since the State of Kentucky lies within the Sixth Judicial Circuit, we understand, of course, that the tax advisers of the Willetts had in mind the point that if the question should go to the Court of Appeals for the Sixth Circuit, that Court would rule that a partnership interest is a capital asset, the sale of which results in capital gain. And so we pass on to another reason why we are not impressed by petitioners' argument that it was unnecessary to form Wildwood Corporation as a way of obtaining capital gain treatment. It must be assumed that Friel and his associates also were equally tax conscious, and that they wanted to avoid having a low basis in their hands of the whiskey warehouse receipts and the whiskey covered by the receipts because, as they knew, the market values of the inventory of whiskey were substantially higher in July and August 1947 than the bases of the warehouse receipts and the whiskeys were to the partnership. The record before us is perfectly clear on the point that Friel and his associates were *119 interested in obtaining the whiskeys covered by the warehouse receipts. For example, in the negotiations with the Willetts the then market values of the inventory of whiskeys held by Wildwood Corporation were considered and the price to be paid for the common stock of Wildwood, which was agreed upon, was based upon such market values. In addition, Metzger testified that it was deemed advisable for certain tax reasons, that a buyer corporation should not purchase 80 per cent of the common stock of Wildwood, but should purchase less than 80 per cent. This is indicative of the concerns of the buyers of the stock of Wildwood in tax consequences. The buyers had to give consideration to the provisions of the 1939 Internal Revenue Code which related to tax-free exchanges, corporate distributions, and basis for gain or loss, such as sections 112(b)(6) and 113(a)(15). In fact, Distillers Distributing Corporation purchased less than 80 per cent of the common stock of Wildwood and thereby avoided the provisions of sections 112(b)(6) and 113(a)(15). No representatives of Joseph Seagram & Sons Co., or of Distillers Distributing Corporation, or of West Shore Wine & Liquor Company, Inc., gave testimony *120 in these cases. Friel did not give testimony. If petitioners, under their burden of proof, had called any of such persons to testify perhaps a great deal which is left to surmise would have been clarified. There is a gap in the record because of the lack of testimony from representatives of the buyers. Perhaps, if they had been called as witnesses their testimony would not have been favorable to the contentions of the petitioners about the reasons for forming Wildwood Corporation. At any rate, lacking such testimony and upon consideration of all of the facts and of the sequence of steps and events, we think a reasonable inference is from the entire record, that Friel and those whom he represented were not interested in purchasing interests in a partnership and it was necessary for the Willets to form a corporation, transfer the partnership's inventory to the corporation, and negotiate for the sale of stock of the corporation in order to have a transaction, the gain from which surely would receive capital gains treatment. We recognize that in his testimony, Metzger said that he did not know the reasons for organizing Wildwood, and the record does not show that Metzger suggested to the *121 Willetts that Wildwood ought to be created, or that Friel did so. But our credulity undergoes considerable strain under petitioners' bland contentions that the creation of Wildwood was prompted by considerations which had nothing whatsoever to do with arrangements for the disposition of the inventory of whiskey and warehouse receipts. We are unable to accept such contention or believe that contention because of the closeness of the intervals in the timing of all of the steps, because of practical considerations, and because petitioners' explanations of why Wildwood Corporation was formed are unconvincing and weak in addition to being self-serving. [3]
It has been said that " *122 to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation; * * * that the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and that escaping taxation is not 'business' in the ordinary meaning"; National Investors Corporation v. Hoey, 144 Fed (2d) 466, 468; Moline Properties, Inc. v. Commissioner, 319 U.S. 436; and, that "in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal". Moline Properties, Inc. v. Commissioner, supra; Higgins v. Smith, supra; Gregory v. Helvering, supra. Petitioners argue that their intention in forming Wildwood Corporation was that Wildwood would engage in the business of acquiring, bottling, and selling whiskey. The evidence which petitioners contend supports their argument is that Wildwood applied for a basic permit to conduct the business of a wholesale liquor dealer on August 13, 1947; that Willett Distilling Company, in August 1947, received two carloads of bottles (3,000 cases) *123 which had been ordered for the purpose of being used in the bottling of the whiskey inventory of the partnership which was subsequently transferred to Wildwood, and a quantity of labels to be used on the bottles; and that Wildwood made sales of whiskey warehouse receipts. Otherwise, petitioners rely upon testimony of members of the Willett family to the effect that the members of the partnership "definitely decided not to sell" their interests in the partnership, and, therefore, instructed their attorneys to form Wildwood Corporation; and that this decision was influenced, in part, by the ending of the World War II excess profits tax on corporations. With respect to the decision of the Willetts, which was made about two weeks later, to sell all of the stock of Wildwood, petitioners give the explanation that on August 14, a fire occurred at the plant of Willett Distilling Company which destroyed part of the plant, and that the damage caused by the fire, plus the attractive offer of Friel and his associates for Wildwood stock persuaded the Willetts to abandon their recently made decision to have Wildwood Corporation carry on the wholesale liquor business. None of these arguments are *124 convincing or persuasive. The issue must be decided upon what was done; not upon what petitioners assert they intended doing. It is immaterial that the excess profits tax on corporations was repealed, and that the distilling corporation ordered some bottling supplies to use in its own bottling plant, for which, incidentally, no payment was made by Wildwood; and we must regard the occurrence of a fire at the distillery owned by Willett Distilling Company as an accidental circumstance which is not entitled to receive any weight because Wildwood had a substantial inventory of whiskey in warehouses with which to carry on its wholesale liquor business of selling whiskey warehouse receipts until the distillery could resume production if it was created to and did engage in business. Furthermore, we find from the entire record that Wildwood did not engage in any business at any time in spite of the purported sales by Wildwood, in two instances, of warehouse receipts for a total of 60 barrels of whiskey to R. L. Buse Company in the early part of August 1947. Members of the Willett family exercised complete control over the Willett Brokerage Company partnership and Wildwood Corporation; the *125 partnership, in August 1947, had not been dissolved; the partnership retained an inventory of whiskey warehouse receipts; and it was merely a matter of form to type the name, "Wildwood Corporation" over the printed billhead of Willett Brokerage Company. Nothing in the record shows when or with whom R. L. Buse Company placed its two orders for warehouse receipts for 60 barrels of whiskey. Thompson, who was a member of the partnership which continued in existence, handled the sale to Buse. Under all of the circumstances, the two transactions with Buse were not substantial, and we regard them as insufficient to establish that Wildwood engaged in "business" in the ordinary meaning. National Investors Corporation v. Hoey, supra. The following summary of the steps which were taken establish, in our opinion, that Wildwood was intended to be and in fact was no more than a structure through which the partnership transferred its inventory of whiskey warehouse receipts to the buyers, and was, therefore, a subterfuge, notwithstanding petitioner's assertion that Wildwood was organized to carry on a wholesale whiskey business and that the members of the partnership "definitely *126 had decided not to sell" the whiskey warehouse receipts: 1. July 1, 1947 - Thompson discusses selling the partnership and its inventory with Metzger. 2. July 3, 1947 - Willett Brokerage Company partnership sends inventory to Metzger. 3. July 7, 1947 - Metzger sends inventory to Friel. 4. July 30, 1947 - Wildwood Corporation is organized. 5. July 31, 1947 - Substantially same inventory passes from partnership to Wildwood. 6. Aug. 6, 1947 - Metzger advises Thompson "a client" (who is Friel) is willing to make a contract at once to buy Wildwood stock. 7. Aug. 11, 1947 - Arrangements are made for Willetts to meet the "client" (who is Friel). 8. Aug. 19, 1947 - Willetts meet Friel. 9. Aug. 21, 1947 - Willetts and Friel agree on price of Wildwood stock at market value of inventory. 10. Sept. 19, 1947 - Agreements, dated back to August 15, covering sale of Wildwood stock are signed. "A given result at the end of a straight path is not made a different result because reached by a devious path * * *." Minnesota Tea Co. v. Helvering, supra.
We think that the only conclusion properly to be made is that the partnership initiated the negotiations which, when *127 it was evident that Metzger's client would not purchase partnership interests, culminated in the sale of Wildwood Corporation stock, and that the organization of Wildwood was for the purpose of carrying out the negotiations instituted by the partnership. In other words, the sale effected by the transaction involving Wildwood stock was in substance one which was arranged by the partnership. Fairfield Steamship Corporation, 5 T.C. 566, affd. 157 Fed. (2d) 321; Meurer Steel Barrel Co. v. Commissioner, 144 Fed. (2d) 282; Gregory v. Helvering, supra; MacQueen Co. v. Commissioner, 67 Fed. (2d) 857. Cf. United States v. Cummins Distilleries Corporation, 166 Fed. (2d) 17, where a corporation (standing in the position of the Willett partnership) had not negotiated for a sale of assets prior to a liquidation; and Ripy Bros. Distillers, Inc., 11 T.C. 326. "The law will look through forms to substance." Hellebush v. Commissioner, 65 Fed. (2d) 902. Although the petitioners and their associates went through all the formal steps of forming a corporation, transferring the inventory of *128 warehouse receipts to it in exchange solely for its stock, and then "selling" such stock to corporations which were controlled by those who were anxious to acquire the inventory, it must be concluded that the corporation, Wildwood, must be disregarded, and that all of the separate transactions were but component steps of a single transaction, namely, the sale and transfer by the partnership of its inventory to corporations controlled by the corporation which Friel represented. S. Nicholas Jacobs, 21 T.C. 165, 169, affd. 224 Fed. (2d) 412; Howard A. Jackson, 24 T.C. 1, affd. 233 Fed. (2d) 289. It is held that the partnership is taxable on the gain realized in the transaction with Friel; that such gain was realized from the sale of an inventory of warehouse receipts; and that the gain constitutes ordinary income of the partnership. S. S. Pierce Company v. United States, - Fed. Supp. - (U.S. District Court of Mass., July 18, 1957). It is held, further, that the two transactions with R. L. Buse Company were sales of the partnership, the gain from which is ordinary income taxable to the partnership. The next question is whether *129 Lambert's transfers in January 1945 out of his interest in the Willett Brokerage Company partnership of a 286/5000 interest to each of the children, John, Paul, and Mary C., served to increase each donee's interests. These children were recognized by the respondent to be members of the partnership. Also, a gift at the same time from Lambert to Thompson of a 286/500 interest has not been questioned by the respondent. Respondent contends that the transfers in question served no business purpose and should be disregarded in considering Lambert's share of the partnership income for each year. The transfers of interests by Lambert were completed gifts according to the standards which are applied in determining whether completed gifts in praesenti are made. The evidence shows that John, Paul, and Mary C. possessed and exercised unfettered control over the interests which were transferred and acquired full ownership of the interests and of the income produced by such interests. Theodore D. Stern, 15 T.C. 521; Edward A. Theurkauf, 13 T.C. 529; Seabrook v. Commissioner, 196 Fed. (2d) 322, 326. The remaining question is whether four other children, *130 Norman, Joseph, Robert, and Charles were members of the partnership. Among the criteria which are to be applied in determining whether a taxpayer is a member of a partnership is the existence of an intent to join together in the conduct of the business. Commissioner v. Culbertson, 337 U.S. 733; Commissioner v. Tower, 327 U.S. 280. Capital contribution is another factor to be considered. It is not necessary that the capital contributed by one of the partners shall have "originated" with him. If a valid and complete gift of capital to him has been made by a relative and he uses it as his contribution to the capital of the business, such source of the capital constituting his contribution does not in itself and alone prevent his becoming a member of the partnership provided there is the required bona fide intent to join together in the present conduct of the business. The evidence shows that the gifts of capital, consisting of parts of the partnership interests of Lambert and Mary T., which were made to Joseph, Robert, and Charles were unrestricted, unlimited, *131 unconditional, and complete. Each of these individuals gave testimony in these cases, and upon consideration of all of the evidence it is concluded that each entered into a partnership agreement of his own free will and intended to become a partner. Each exercised control over his interest in the partnership, received his share of the income, and exercised control over his share of the income. Each enjoyed and received the fruits of his interest in the partnership. With respect to Norman, there is no evidence about his intent with respect to joining with the others in the present conduct of the partnership business. He gave no testimony. He did not participate in the conduct of the business. He lived in California and he engaged in his own business pursuits. Lambert followed the same procedure in making a purported gift of an interest in the partnership to Norman as in the instances of his transfers to his other children. A capital account on the partnership's books was opened in Norman's name and a share of the profits was regularly credited to this account. But the question of whether Norman intended to join with the others in the present conduct of the business and to share in *132 losses as well as profits is not answered merely by a showing that the various formal steps were taken by Lambert. Petitioners have failed to prove that Norman was a bona fide member of the partnership. Salvatore Apicella, et al., 28 T.C. -, (August 9, 1957). Respondent relies solely on Herman Feldman, 14 T.C. 17, affd. 186 Fed. (2d) 87. That case is distinguishable on its fact from these cases in respect of the question whether Joseph, Robert, and Charles were partners. It is held that the parties to the partnership agreements of 1945 and 1946, including Joseph, Robert, and Charles intended in good faith to join together, with a business purpose, in the present conduct of a business, and that the interests in the partnership of John, Paul, and Mary C. were increased by Lambert's gifts to each of them in January 1945. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings have been consolidated herewith: Docket No. 47501, Mary T. Willett; Docket No. 47502, John T. Willett; Docket No. 47503, Thompson Willett; and Docket No. 47504, Thompson Willett and Virginia S. Willett.↩
2. The record is not exact about the relationship of Distillers Distributing Corporation and West Shore Wine & Liquor Company to Seagram & Sons Co., and does not show when Distillers Distributing Corporation and West Shore Wine & Liquor Company were organized.↩
3. We do not agree with the suggestion of petitioners' counsel that an effort on the part of the Willetts to reduce taxes by adopting a course of procedure which, taxwise, would be the most favorable to themselves, as well as the purchasers of Wildwood stock, might be regarded as "a scheme to defraud the United States of its taxes." Taxpayers have a right to endeavor to legitimately seek to obtain lower tax liability.↩